19-3891. And we'll hear first from Mr. Killian. Yes, good afternoon, Your Honors, and may it please the Court. I'm Brian Killian on behalf of the appellants. I'd like to reserve three minutes for rebuttal. Granted. Thank you. This case presents a number of important jurisdictional questions. There are the jurisdictional questions that relate to Article 3 and the Plaintiff's ADA claim, specifically whether someone who has never done any business with a defendant has standing to sue that defendant for a transformative injunctive belief. But before I get into that, the Court's letters have indicated some concern about whether and to what extent those important Article 3 questions are presented in this appeal. And so I'd like to start there. This Court's appellate jurisdiction surely is broad enough to reach the question of Plaintiff's Article 3 standing. But before you get into the generalities, let me drill down on some specifics and perhaps we can clear out the brush. So your main argument is that appellees have no standing. And given that the matter before us is an appeal from a motion to compel arbitration, I'd like to explore whether it's appropriate or perhaps necessary for us to address standing. Now, we can all agree that a denial of a motion to compel arbitration is reviewable on appeal under the Federal Arbitration Act, correct? Absolutely. That's why we're here. Okay. But except in limited circumstances, 28 U.S.C. 1291 and cases interpreting the provision teach that there is generally no appeal from a denial of a motion to dismiss premised on a lack of standing. Well, Your Honor, we're here under 9 U.S.C. Section 16A, which is the specific appellate jurisdictional statute that applies to denials in a situation like this, where a party, as Uber, files a motion to stay a lower court proceeding under Section 3 of the Federal Arbitration Act. That's why I want to get into a little bit further into that, because the management judge did, in fact, talk about standing. Absolutely. In her opinion. And the question I really have for you is, did she decide the issue of standing, or did she not decide the issue of standing? Sure. On that, Your Honor, we believe she did decide. I'd point the court to page 812, which is page 9 of the District Court's decision, specifically footnote 8, and then the text accompanying that footnote, where the judge, in our case, quotes at length a block quote from the District Court in the Chicago Access Living case, and concludes that the plaintiffs here, involving Pittsburgh, have standing for the same reason that the plaintiffs had standing in the Chicago case. So if she decided the standing issue, then aren't we precluded under Griswold and under 1291 from actually ruling on the standing issue? No, not at all, Your Honor. Aren't we just required to focus only on the motions to compel arbitration? So a couple responses to that, Your Honor, because I do agree that is the threshold question here. Griswold doesn't preclude the court from considering these issues. On the contrary, Griswold, we think, supports what we've called sort of the discretionary approach. It recognizes that there are circumstances in an interlocutory appeal where the Court of Appeals may consider other issues, including questions of Article III standing, that are, say, not within the sort of primary purpose for the court's Griswold, in fact, cites a number of cases where this was done. It reaches the conclusion in that particular case not to review Article III standing, because the question of Article III standing in Griswold was not inextricably intertwined with the question about arbitration. And we believe our case... Let me ask you a question there. So are you, are you arguing that the only instance in which we can actually address Article III standing is if, under the inextricably intertwined rubric, under the pen and jurisdiction rubric? Well, so that's, that's our view of Griswold, although I can add an asterisk on that as well, because Griswold recognizes one other circumstance where the court can consider Article III issues in the context of an interlocutory appeal. Our position, Your Honor, is that Larson is the better case to follow in this. So I just, I want to be clear that I'm not, I'm not saying that that's, that's exactly our position, but I think we sort of win under either approach and get to the question of... That you're referring to in Griswold that would permit, besides the pen and jurisdiction standard of inextricably intertwined? Yeah, it, there's, there's an extended discussion for about two or three paragraphs of this Majestic Star Casino case, where the court distinguishes Majestic Star, where the court, this, this court considered Article III standing for the first time in interlocutory appeal, because it hadn't been raised in the district court. And so Griswold... And the Majestic Star goes on to talk about the standard that's applicable for pen and jurisdiction, that is, that it's inextricably intertwined between Majestic Star and the court found it was. How does it present a different ground? Well, I guess if I take the, the premise of the inextricably intertwined holding of the court in Griswold is that there is an order of the lower court that specifically addresses the question. And then, so this court asks, is that separate order inextricably intertwined with the order over which you have immediate appellate jurisdiction? And so when there is no inextricably intertwined question becomes a bit of a formalistic, difficult one to apply. There's, the lower court did not pass upon, or did not issue a specific order on that point. But, so can I just tease that out? I mean, I'm sorry, I'm really sorry for interrupting. No, that's fine. I'm here to answer all your questions, Your Honor. So I'm going to stop every time you've got something to ask. All right. So, so, I mean, it seems, though, that at one level, there has to be a breaking point, right? If, if, if the district court rules and denies a stay of arbitration under Section 3 or denies a compelled arbitration under Section 4, you know, denies whatever else, it would get you a Section 16 interlocutory appeal. And along the way reaches like, let's just say, 15 other rules. You know, we don't have personal jurisdiction over this one plaintiff. We don't have, you know, this one plaintiff, you know, time barred. We could, we could do whatever you want, but there's 15 other rulings. It strikes me that the right analysis wouldn't be necessarily that all 15 can be included in the interlocutory appeal, nor would the analysis be that none of the 15 can be in the interlocutory appeal. The analysis would be which of those other 15 issues are so inextricably intertwined with the denial of Section 3 request or the denial of a Section 4 request. And so, and so, so that's just kind of a baseline question on the law. I mean, I've laid out a few options that might not be all of them, but what do you think of those options? Sure, I'll do my best to answer them, because I think that there's, Article III issues are kind of special, right? They're the kind of court, the issues that this court must consider mandatorily. Article III issues, you know, parties can't waive. Tactical behavior can't prevent a court from reaching those questions. And so they are, they are a bit too generous. And I want to put a pin in that because I think it's important to remember we're talking about the power and authority of the court to act, not a question like, you know, what is the, you know, proper standard of care in a negligence case, and that may have been passed upon in the process of ruling on a motion to compel arbitration. That, you know, is a true merits question. But to answer your question specifically, Judge Hibbs, I think the answer would be in the text of Section 16A. Section 16A of the Federal Arbitration Act says that in order denying a motion to compel arbitration under Section 3 is immediately appealable. Now how this court interprets order, whether it's a formal interpretation, so the four corners of the of the document, and so anything that is formally within the four corners of that document may be the order that is up on appeal, or the court may take a more substantive approach. I'm not aware of a Third Circuit precedent, one way or another, that construes the word order, but I would point this court to the Supreme Court's decision in the Yamaha case, which was a 1292B certified appeal case. And in that sense, let's assume that the order does include the words of the opinion. And if you look at the opinion, the judge below was asked to address one question. Are plaintiffs equitably absolved from refusing to arbitrate? And Uber presented two arguments. One was, do the claims implicate Uber's terms and uses? And the magistrate judge addressed that issue. And her answer on that was no. Then, because Uber's second argument was not that plaintiff had no standing, but it was that because in Uber's view, plaintiff's theory of standing was based on a deterrence theory, Uber's arbitration agreement was necessarily implicated, and thus the doctrine of equitable estoppel required them to arbitrate. So is that what she addressed? Absolutely. She absolutely addressed that because she was asked to address it. However, if you look at what she did first, she could quite easily have stopped right then and there. She addressed it simply because she was asked to address it. She could have outlined basic contract arbitration principles. She could have outlined the requirement for binding a non-signatory in an arbitration agreement to equitable estoppel and explained that plaintiffs have not fulfilled those requirements because they haven't reaped any benefits from the contract containing the arbitration clause. She could have stopped there. Absolutely not. I disagree with that one 100% because I do think that's fine. But the theory, the primary theory that Uber has advanced for why plaintiffs here are equitably estopped is not that their claims, their ADA claims, are the basis or the terms of service of the basis of their ADA claims. We argue that, but the primary theory is that their standing argument is an assertion to this court that relies on the terms of service and that for that same, for that reason, they are opening up the federal courthouse doors on the back of the terms of service that they are then equitably estopped to deny the rest of the terms of service, including the arbitration provision. So I don't view those as, I view those as distinct theories for why the plaintiffs must be required to compel. But the second argument, Judge Beedlesone, is not a, somehow a non-arbitration argument. Well, let me follow up on that because generally I am a district court judge and generally if the Third Circuit tells me to do something, I do it. And one of the things that the Third Circuit tells me to do is if there is a standing issue, I have to address that preliminarily before I address anything else. And here, the Masford judge does not address the standing issue first. She addresses the simple issue first and then she goes into the second one, which I think suggests that perhaps she wasn't addressing standing per se. She was addressing Uber's argument, which raised the issue of standing. I disagree, Your Honor, and I would encourage you to look at the motions we found below. Why she chose to write her opinion in the order she did is sort of beyond my ability to glean from the hard record. But the position we have long advocated and the reason why I think ultimately under Griswold, the equitable estoppel question here is inextricably intertwined with Article III standing is that we believe the only theory by which plaintiffs have Article III standing is one that is, that relies on our terms of service. Now, the plaintiffs have a different Article III standing theory, and the district court in the footnote that I cited to Your Honors a few minutes ago endorses that theory of Article III standing that does not rely on the terms of service. But the fundamental question is what is the basis for plaintiffs' Article III standing? If it is, as Uber contends, that they are relying on the terms of service, then we believe they're equitably estopped. If it is not, what Uber contends, then the equitable estoppel argument has a little more difficulty because it relies then entirely on that one sliver of their reliance on the terms of service as to the claims. Excuse me for interrupting, but the Article III standing is certainly an interesting question that will be reached at some point, but the only question is, is it now? Absolutely. So, I don't know how this court can… You agree that standing has to be assessed in light of the relief that's being requested, right? Correct, but I think I need Your Honor to unpack that. Are you talking about plaintiffs' standing or… The relief requested, the standing to appeal here, the relief requested at this point deals with a motion to compel arbitration. Correct, and the argument… The style of that that's before us. And the argument that we have advanced in support of that, Judge Krause, is that the plaintiff's Article III standing theory is itself based on the terms and conditions. And so, the doctrine of equitable estoppel, maybe I should point the court to that. In the Pennsylvania's doctrine of equitable estoppel, it says that if an individual knowingly exploits a contract, if the individual seeks the benefit of a contract or otherwise embraces the contract, then that individual has to be sort of bound to the entirety of the contract, not just portions of it. And so, the argument that we've, I think, put here and below, that really hasn't changed, is that plaintiff's theory for getting into federal court relies on the terms and service. They've never used our app. They have never signed up for this service, and they have never requested a ride. I think we understand that argument, but we should focus on the question of… I'm trying to, Judge Krause, if I can, because I'm not going to move off appellate jurisdiction, I promise. I just want to explain why these are inextricably intertwined. So, because they rely on the terms of service to show the court that their deterrence alone theory works, then they are exploiting the agreement to open the federal courthouse doors. And that is the type of exploitation that is referred to, that is encompassed within the equitable estoppel doctrines that bind someone to accept all of the terms and conditions. Let me posit this as a sort of counterfactual to help explain why we think that the standing question here actually is the basis for equitable estoppel. And I put this out in my last letter, so if your honors are familiar with it, I'll cut short. If the plaintiffs had alleged specifically in their complaint that they would never sign up for our terms and conditions, that they are opposed to arbitration, and therefore they will never sign up for Uber's terms and conditions, then they would plainly not have a live case or controversy with us. And so, obviously, they haven't said that in their complaint. They've never alleged that they will not sign up for this. And so, implicitly or explicitly, their basis for demonstrating a live case or controversy relies on their agreement to our terms and conditions. And in addition, the other component of the equitable estoppel piece, and the reason I just don't think the court – well, let me – I'm sort of tying myself up in knots here. So, they have this deterrence alone theory. I'll talk in a few minutes why we don't think the deterrence alone theory is sound. But if the deterrence alone theory is sufficient, under the courts that have recognized it, it says that that person is to be treated the same as someone who signed up for the contract, someone who has actually used the services, or as Teamsters put it, they get to be treated as an applicant. So our theory of equitable estoppel… I'm not understanding how those relate to – how that's inexorably intertwined with the question of compelling arbitration. Okay. How is this different in the procedure, in fact? How is this different at all from Griswold? And why aren't we just – why doesn't Griswold just come through here? Sure. The Griswold equitable estoppel theory was not one that was based on the sort of the result of the court's – the substance of the Article III argument. In Griswold, the Article III argument, as I understand it, was that the LLC had dissolved and therefore did not exist to have standing. It's just a question. Does this company exist? Does it not exist? But the equitable estoppel question in there turned on whether a beneficiary of a trust was in a position to rely on – to be bound by contracts that the trustee had signed. So substantively, those two theories of why the plaintiff in Griswold lacked standing and why the plaintiff in Griswold was bound to arbitrate were totally unrelated to each other. Here, we and the plaintiffs strongly dispute the basis for plaintiff's Article III standing. If you agree with us that the basis for their standing is their reliance on the terms and conditions, then we think – and specifically, there's section 3 of the terms and conditions, which provides all the agreements to use and how you use the intellectual property. If that's what plaintiffs are saying is the basis for their standing, then they can't ignore the other section of the terms and conditions that has the arbitration agreement. And so that's why – The plaintiff not only has not reaped the benefits, they don't have – of the services that are provided by Uber, they don't have access to them at all. So where does the app really – how is the app relevant? Okay. Well, so now I feel like we're moving into Article III, Your Honor. But we think the app is relevant because the plaintiffs – under ordinary Article III principles, a person who has never met the defendant, never used the defendant's services, never been to the defendant's building does not have a live controversy with that defendant. They have no personal experience. And in order to maintain prospective injunctive relief, recall that the ADA does not provide damages remedies. So we're not dealing with some sort of retrospective case here. This is a purely prospective case. They don't have the concrete and particularized injury. They are a concerned bystander who disagrees with Uber's policies but have, at the end of the day, just a generalized grievance. And so they come forward to the court relying on a Ninth Circuit case that we think is ill-founded, but be that as it may, that rests on – and asserts something called the deterrence alone theory that says, yeah, I know we've never experienced Uber, but we are injured still. And therefore, we get – well, the question is, therefore, we have standing. That's their conclusion. And our point is, well, if that doctrine works, it's not therefore you have standing. It's therefore you get to be treated like someone who is an Uber user. And every Uber user in the United States agreed to the same standard terms and conditions. And those same standard terms and conditions include an arbitration agreement that requires arbitration of disputes like this one. I'm not sure this is really squarely article 3 standing. I think what we're talking about is your theory that these non-signatories under Pennsylvania law, which I gather you agree either is applicable or is the same as California law, but there's a requirement for the arbitration agreement to be imposed on these non-signatories that they have reaped the benefits. No. I think seek the benefit is, in fact, one of the two formulations of the standard, not reap in the past tense. But the other aspect, the other way this court has characterized Pennsylvania's equitable assemble standard is more than just seeking the benefit, although we think that's what they're doing here. They are seeking the benefit of our terms and conditions, the benefit being, you know, to use our service and to get into court just like other users of our service. But this court has also said that if you knowingly exploit the contract in a judicial proceeding, then you can be equitably established. Can I just trace back your argument? And you can take over where you're at, but let me just make sure that I'm keeping time with where you are. If I understand what you're saying, you're basically saying, well, plaintiffs need article 3 standing in this case. The reason that they need article 3 standing is because they have to have a concrete, particularized injury that's fairly traceable and redressable. And what you're saying is in order to demonstrate that injury, they don't sit there and say, hey, I was out on the street trying to hail a cab or trying to do something like this. They say the way that you order an Uber is through the app, and the app doesn't have wheelchair accessible vehicles. And that's in the terms and conditions on the app. So the reason, if I understand your theory, that they have standing is because you say, look, you don't hail an Uber on a street corner. They could just try to hail an Uber on a street corner, and that would work, and maybe they could have standing if the Uber wasn't wheelchair accessible. But that's not how it works. It's done through an app. It's done through an app for people. And so what you're saying is the injury that they are claiming to experience is the fact that the terms and conditions of that app don't allow them to get wheelchair accessible rides. Very close. But the very final step of that, Judge Fitz, I think is where I have to clarify our position. So you're right in describing how Uber operates. Uber is not a taxi service. Uber is not a publicly accessible building. It is available only to people who have signed up for our app. Uber has intellectual property within the app and therefore provides a license to use that intellectual property only to people who are willing to submit to Uber's conditions. It is not that the terms and conditions themselves deny plaintiffs some right that they claim under the ADA, and that's where I wanted to clarify what you were proposing, Judge Fitz. Nobody has challenged that Uber's terms and conditions are discriminatory or that they even have anything to do with waves. In fact, as plaintiffs allege, Uber offers the wave option in its app in many different markets. It's that ‑‑ but the rest of your point is our view. Yes, they are claiming that they never signed up for the app, that they have never even used the app because it doesn't provide them the service, the level of service that they think that the ADA requires. Normally, under normal Article III conditions, a person who is just sitting in their house and has never gone to see the defendant, never interacted with the defendant, and never used the defendant's services doesn't have Article III standing. That's the famous clip of Sierra Club versus Morton or Mineral King. Why didn't a member of the Sierra Club go visit that national forest if they would have had standing? And so what you're saying is why didn't you use the app? If you used the app, you'd have standing. But if you used the app, then you'd also be subject for arbitration agreement, and you can't avoid the arbitration agreement yet. And maintain it in court. Exactly. That's the dilemma the plaintiffs themselves are trying to work around in this case. And so that's why we think their standing theory fundamentally relies, whether they say it explicitly or not, they are relying on Article III doctrines that rely on those terms and conditions, rely on their agreements to, adherence to, acceptance of the terms and conditions, even though they themselves have not. Excuse me. Aren't you just taking issue with a deterrence theory of Article III standing? A deterrence alone theory? Absolutely. We think there's serious problems if a plaintiff has no personal experience whatsoever with the defendant and says, I'm still deterred. There are plenty of cases that talk about the circumstances where you don't have to go through the futile gestures if you know that it's simply not available. Indeed, in the Raytheon case, I think the slide for you. The D.C. Circuit case, I think. The D.C. Circuit case. The court made the point that it might be — I'm sorry, I was thinking about access living. In the access living case, that the circumstances would be different if there was a categorical denial of wheelchair-accessed vehicles. So a couple reactions, may I, Judge Krauss? Sure. Number one, that question was not presented in the Seventh Circuit, of course. The waive option was enabled in Chicago, and so the plaintiff there, we weren't fighting on the exact same terms that we're fighting here. But number two, the court said perhaps the circumstances would be different if there was, quote, a categorical refusal. And it raises questions because the parties didn't really argue this issue, what the court means by categorical refusal. We don't think a categorical refusal could mean every ADA violation. Otherwise, the deterrence doctrine does, in fact, swallow all of ordinary Article III standing. What we think the Seventh Circuit was referring to in that paragraph that Your Honor cites is referring to something like an express and outright refusal to deal with a specific category of individuals, akin to the one that gets used a lot, the example that gets used a lot of the restaurant that uses the whites-only sign in the door. And, you know, the Supreme Court and other courts have recognized that in a circumstance like that, you know, the defendant doesn't have to go in. Now, this isn't in an Article III context either. So we're, you know, but be that as it may, we don't think that the Seventh Circuit's decision, that paragraph of dictum, really applies to what's going on here. Uber is not categorically refusing to deal with individuals who have motorized wheelchairs. There are many who have signed up for the Uber app and many who have used the service. But, I mean, at one level, it's not, I mean, you know, a lot of places say we aren't categorically refusing to deal with people with mobility difficulties. Our aisles just happen to be a little too narrow for wheelchairs to fit through. We'd love you to still shop here. Our aisles are just too narrow. And so, I mean, isn't kind of the same thing, you know, and maybe you could go about getting your food from our store another way, you know, or your services from our store another way. I mean, there's a little of that going on here too, right? Isn't the point like, hey, look, we aren't saying, no, we won't provide you with a way. We're just saying, you know, our app doesn't give one and everything you have to order, the only way that you can get our services is through the app. And there's no option on the app. So, I mean, it kind of strikes me as saying it's a little bit like the aisles are too narrow, but we'd still like you to shop here. I mean, isn't it kind of the same? I think, well, no, for this main reason, Judge Pipps. I think that ultimately here what the plaintiffs are complaining about is the lack of waves on the road in Pittsburgh, right? That's what their case seeks. They want us to find ways to guarantee wave availability. They want us to provide ways of connecting them with wave drivers, right? And so that is essentially the exact same relief that was being sought in the Seventh Circuit case. With the one difference being that in the Chicago case, the wave option was enabled within Metropolitan Chicago, whereas in this Pittsburgh case, the wave option is not enabled. We think that fundamentally the two cases aren't distinguished by the presence or absence of the wave option because the plaintiffs are seeking the exact same relief at the end of the day, which is to transform how Uber operates within their local market by providing or ensuring in some unspecific way a certain number of waves available on the road and a way for drivers to connect with them. So the fact that the wave option is not enabled in the app in Pittsburgh, we don't think sufficiently distinguishes this case from the Chicago case. But even if it does, even if it does, we think that would mean that the Seventh Circuit's holding for Article III standing means that a plaintiff does not have Article III standing to challenge wave availability more generally. Now, do plaintiffs have standing to compel Uber to enable the wave option? Because that would be the only sliver of this case that would be left if you sort of took the Seventh Circuit's logic. I couldn't understand, in other words, how a plaintiff in a city like Chicago where the wave option is enabled would be kicked out of court and not able to get comprehensive relief. But in a city like Pittsburgh, where the wave option is not enabled, the plaintiff would suddenly have Article III standing to challenge the entirety of Uber's business model. These are very interesting issues as to the Article III standing. But we are dealing, again, with the order on a motion to compel, and we are looking at a claim on its face for equitable establishment purposes. As you're trying to apply this against non-signatories, that they're not able to partake of the benefits of the app. The benefits being actually having non-discriminatory bribes. Correct. So that claim, I don't see how that claim maps onto the argument that they have, as Pennsylvania walks with it, that they have exploited the agreement or that they have received the benefits of the agreement. Sure, and Judge Krause, fundamentally, the concern is whether they are exploiting the agreement to demonstrate their Article III standing. It is not whether they are exploiting the agreement to demonstrate their claim, the merits of their claim. We think there's a small component of their claim on the merits that will ultimately turn on the terms of service. But Pennsylvania's Article III, excuse me, Pennsylvania's equitable estoppel doctrine, says that if you are knowingly exploiting the terms of the contract in order to pursue your relief, then, and we think that encompasses, that pursue your relief stuff encompasses not just the 12B6 elements of your claim. It also includes the theory that keeps you in the court where you are. And so they chose to come to federal court. And in order to be in federal court, they need to have a concrete and particularized injury that is actual or ongoing. Under ordinary Article III principles, I'm getting myself wound up in a question. I guess why I'm struggling, maybe you can help me with this, although we've exceeded time, and Mr. Seaborne, you can be sure that you'll have plenty of time as well. But I guess I'm struggling because what you're suggesting ties this to the terms and conditions of the agreement. That's not their theory of standing at all. And so I feel like I'm right back at the beginning. Your theory of standing, and I understand that there are arguments that can be made, and that's sort of your defense as to why there's not standing. But when we're focused on the question of equitable estoppel, we're looking at whether in terms of what they've claimed, their claims are their claims so inexorably intertwined with the issue before us, that is, the denial of a motion to compel, that we should be reaching the question of Article III standing, including those very interesting defenses and culture theory that you've put forward. I think we've come right back to the beginning, because what you're proposing then is to say, Uber's argument for why plaintiffs have standing is one this court will not consider. You're going to accept everything that the plaintiffs have said for why they have standing, and that would kill our equitable estoppel argument. Counsel, I assume you're here because you want to make sure our questions get answered. So especially when we're trying to deal with this technology, I ask that you not interrupt. I apologize. There will be, in any event, there will be opportunity to litigate standing, Article III standing. If we disagree with you for purposes of disappeal, it goes back, and at that point, isn't what happens that you have a motion to dismiss dealing with Article III standing, or you ask the court to certify that question, the Article III standing question, back to this court? But how do we, in the face of Griswold, get to that Article III question now? I'm still not seeing the path there. I invite you to help me get there. All right. I will try one more time, and I apologize for interrupting Judge Krauss. As Your Honor just posed the question, the court has to decide. In order for Uber's equitable estoppel argument to work, the court has to decide what is the basis for plaintiffs' Article III standing. Is the basis the contract, or is the basis something else? What gives them that injury? And so when Your Honor says we can't consider Article III standing, I hear that as saying we're assuming that a plaintiff's theory of Article III standing is correct and that that, therefore, takes most of the legs out of our equitable estoppel argument. We've proposed one theory of Article III standing. The plaintiffs have proposed a different theory of Article III standing. Our theory argues that they rely on the contract. Their theory contends that they do not have to rely on the contract. And so if you're saying we can't even consider this as a threshold matter, then our equitable estoppel argument is almost impossible to pose because it's essentially saying the court will assume that plaintiffs have Article III standing apart from the contract. Uber, therefore, has no equitable estoppel argument because plaintiffs have come to this court on a theory of Article III standing that doesn't rely on the contract. What's really strange about that is that feels like half a loaf, maybe to you and your clients less than half a loaf. But at one level, interlocutory appeal is not the norm. It's never been the norm. And so defendants can challenge a plaintiff's standing. They can go all through a case. There can be a huge injunctive relief granted. And then on appeal, the answer is no standing. Wipe all that clean. But interlocutory appeal is this kind of separate sneak peek, this quick hit into the court of appeals, and it's limited. And so I guess as I'm thinking through your position, we need standing right now for the relief sought. Standing Summers v. Earth Island wasn't the first court to say it, but when they said it, I finally understood Article III standing, or at least this component of it. And it says that we look, when we evaluate Article III standing, we look at the different types of relief that are sought. We have to have standing for each type of relief. And so when we look at this interlocutory appeal, Uber is the one that wants relief. Plaintiffs don't want anything out of this interlocutory appeal. They probably want it to go away. So Uber is the one that wants Article III relief, wants relief. So we look at Uber standing in this context. And we say, yes, Uber does have standing in this context. And after we do that sneak peek and then evaluate whether or not arbitration should be compelled, then we say, okay, the party that was seeking relief from us on this appeal, Uber, had standing. Now plaintiffs don't want any relief out of us right now on appeal. And so we don't need to look to their Article III standing at this point in time. So can you just – I mean, I know that you're trying to link the two. But if we think about relief, it starts with the fact that the only party before us is Uber who wants relief, and plaintiffs don't want relief here. So if they don't want relief on appeal, it seems a little strange to look at their Article III standing at this quick peak, not later. That may come well later. So what do you think? Several responses, Judge. So number one is it feels strange to me to speak about Uber's Article III standing. There are questions about whether Uber has appellate standing. Is Uber the party who lost on the motion in the district court, and thus is that the person to the party of the proceeding who is the appropriate one to bring something up to the court of appeals? But Article III standing is a question about – it focuses on the individual, the party who tried to get into federal court in the first place. And who invokes the federal court's jurisdiction, and you're the one – your client's the one that's invoking the federal court's appellate jurisdiction. I mean, you can bring a freestanding – like, you didn't – I mean, if I understand the FAA, and you can bring a freestanding Section 3 claim. You don't need to be sued before you bring a Section 3 claim. You don't need to be sued necessarily before you bring a Section 4. For Section 4. Okay, Section 4. You don't need to be sued first for Section 4. So the person that would invoke – a person who wants relief under Section 4 would say, oh, we have standing to get this relief. Right. And then they need it. And so it strikes me that that standing would have to continue under Section 16 if you want appellate review. And now you're invoking Section 16 to get – I think it's Section 3 relief, but I wasn't sure if you also wanted Section 4 relief that's just purely stay. That's what we filed for, correct. And so a couple responses to that still, Judge Phipps. Number one, Section 3 and Section 4 are different. I mean, there are formal distinctions. In a Section 4 situation, the movant is the one who's trying to get in the federal court. Uber does not want to be in federal court. So we've not invoked the court's Article 3 power in that respect in the way that the plaintiffs here have when they filed their claim in federal court in the first instance. A Section 3 motion is defensive. A Section 4 motion is offensive. And so like other defenses that someone may raise during the course of someone else's proceeding, we think that Congress's decision under Section 16 to give this court interlocutory appellate jurisdiction over the denial of that defense also brings up with it the question whether the plaintiffs in the first instance should have been – was it appropriate for them to come into federal court. I guess I resist the inclination to compare this directly to Section 4 because if they had never sued us in federal court, I don't think Uber would be here on a Section 4 petition trying to compel arbitration with them. We don't think we have a real live dispute with people who aren't signed up for the app in the first instance. And so we don't move to compel arbitration with all non-users of Uber in the United States. It's only those who've come to Article 3 court in the first instance, despite never having signed up for the app. I'm sorry, I think – Let me go back to the – my first issue was whether or not the magistrate judge below had decided the standing issue. And you said, yes, the magistrate judge has decided the standing issue. Now, there is a motion below, a motion that's below, which is kind of on standing. So if, in fact, the judge had already ruled on standing, why did you not withdraw that motion? Because wouldn't it have been law of the case? So you would be asking her to decide something that she had already decided. So the basis of the motion to dismiss that remains pending below is not this basis. It's not standing. It's standing of the trade association only. It's a 12B6 motion to dismiss the remainder of the claim. So it is not – It did not – Not the same theory. Different theory. Completely different theory. Correct. So it has no bearing on what we are talking about in this instance. Correct. My understanding is we did not reassert these arguments. After what the judge said in her decision below, we weren't going to belabor the point by reasserting a standing motion to dismiss. We had a separate motion to dismiss the trade association because it's not a person and has different standing considerations in this context. And so the remainder of our motion to dismiss is 12B6, problems with the merits of the claim. So, your honors, I've used a substantial portion of the time today. If the court would still permit, I'll take a few moments for rebuttal. Appreciate it. And let's hear from Mr. Seaborn. Thank you. Thank you, your honors. And I guess I'll start with the issue of standing and whether it's even appropriate to have standing raised at this point. And here there's actually nothing for Uber to appeal on standing. There's been no actual injury related to standing. As your honors have pointed out, there is a motion to dismiss pending. And Uber could have let the district court do its job and raise standing for these plaintiffs in the context of a motion to dismiss. But it's trying to skip a step and sneak in pending jurisdiction on a motion, on a very narrow issue and appeal, on a motion to compel arbitration, where despite the fact that the district courts had to address standing arguments raised by Uber in the context of a motion to compel arbitration, the court didn't rule on standing. So, in fact, Uber is actually trying to sneak in pending jurisdiction rather than letting the district court do its job. There might have been a motion to dismiss on standing grounds before the magistrate judge, but if Uber, reading between the lines, thought that the judge had made up his mind there and that it would be futile for them to put in a motion to dismiss on that basis, why shouldn't we reach the same conclusion that there was at least an implicit decision on standing and that the magistrate viewed that as part and parcel of a decision she was making as to compelling arbitration? Your Honor, we disagree that there was a ruling on standing that the court ruled on the motion at hand, but to play it out, if there indeed was enough of an implicit ruling or enough indication that the district court had made its decision on standing, we'd be in the same situation that the court was in Griswold and DuPont. And so this case, because there was no ruling on standing, is even more extenuated than Griswold and DuPont. But either way, the interlocutory appeal and the attempts to get pendent jurisdiction is a very, very narrow approach. And there are plenty of opportunities to raise standing, and if indeed the district court had ruled on standing, as in Griswold, there is a later opportunity to appeal. So it's, in a sense, they're trying to have both arguments, but either one under Griswold and DuPont means that this court, the Third Circuit, can say, no, we're not going to do that. We're only here to address what is essentially the only injury to Uber. Uber is the party agreed. They seek to enforce an arbitration clause, and that's why we're here. We're not here to address anybody else's standing. There is no pendent jurisdiction. So in a sense, this is much like summer's earth in that Uber has a kind of hypothetical or procedural injury that this is not the vehicle or form to address it. Ms. Gisner, I'd ask if you could speak a little closer to the microphone. It's a little bit difficult to hear. And while you're arguing that that's really not something we need to decide, I understand Mr. Killian's argument. It is that when it comes to holding these non-signatories to the arbitration provision of the agreement, that question, whether you can, because they have received the benefits of the agreement, or they're seeking to avail themselves of the agreement, requires us, like I think he would contend the magistrate court did, to consider both sides of the Article III standing question. And if that's true, then why aren't they innocently intertwined? Your Honor, our understanding of why the magistrate judge addressed standing at all is because Uber raised it in its motion to settle arbitration. Mr. Seaborn, I can't hear you, so you're going to have to get closer to the microphone. Maybe speak a little slower. Your Honor, can you hear me now? No, a little bit. I will hold the mic closer. Can you hear me now? Yes. Okay, thank you, Your Honor, and I apologize for the delay in the sound. So this, the claims at issue, and as I said, the only reason that the district court addressed standing at all was because Uber raised it as a part of its arguments on its motion to settle arbitration. But the claims themselves are not at all based on the terms of the agreement. Can I just tease that out a little bit? Like, Uber says that your standing has to depend on the terms and conditions of the agreement, of its app as used in Pittsburgh. It says you're saying that you can't get a wheelchair, your clients can't get wheelchair accessible vehicles because the app doesn't allow them. And so why isn't that in some way based on Uber's app and the terms and conditions under which it does business? Aren't you reaching in a little to that? I mean, it might not be big, but a little into that? So, Your Honor, under the ADA, under Title III, and I think it's actually appropriate to disavow the court of misnomers used by Uber about these claims. These are not deterrence alone claims. These are not abstract injuries. Plaintiffs alleged that on specific occasions, they've missed events, they've been late to events, they've had to travel miles in a wheelchair late at night when they would have used Uber, but could not because it was inaccessible. And those are actual injuries. And I think the Seventh Circuit was right when it gave the analogy of a person in a wheelchair who seeks to enter a building with stairs. Now, no one, as the Seventh Circuit said, no one is going to argue that person would need to attempt to climb the stairs to assert an ADA claim. But just to tease that out, the reason that that person has standing is because the building has stairs that are inaccessible. And it seems that the reason that plaintiffs have standing here is because Uber's app doesn't allow wheelchair accessible vehicles. So I guess what I'm saying is, what's the difference? It seems like we're getting really, really close to the app. In fact, plaintiffs would use the app if the service was accessible. But that's kind of the point, though, right? We would go to the store if it didn't have stairs. And your reason for standing is the stairs. And so I guess my thought is, isn't your reason for standing here the no-wave app? Your Honor, the reason for standing is the lack of accessible vehicles in the service. And I'll give you an example. So say we take Uber at face value and there's some sort of additional steps plaintiffs have to take, like whether it's downloading the app, making a reservation, going out to meet the vehicle. None of those, including anything to do with the app, would do anything whatsoever to make the service accessible, to fix the barrier. What would do something to fix the barrier is a reasonable modification that would include having wheelchair accessible vehicles in the fleet. So it's not necessarily related to the app. And actually, the reason the plaintiffs didn't download the app is because there are no accessible vehicles in the service. So if it was one accessible vehicle in the service, if Uber just puts one accessible vehicle out in the service, then plaintiffs would have to download the app to get standing? Your Honor, this is somewhat of a situation that was discussed by the Seventh Circuit in Access Living. And they asked the parties to say, where do you draw the line in terms of what level of service is acceptable? And that's a factual situation. That's a factual debate. And we're not here on the facts at that point of the case yet. But the one thing the court did say is that, well, if there was no service whatsoever, meaning that there were no accessible vehicles whatsoever, it would be in a much different position. And that's exactly where we are here. And I think, Your Honor, I just want to also take issue with the idea that this is not a categorical denial of service. Because this not having any wave service whatsoever in Pittsburgh is the equivalent of having a whites-only sign on the door. They're essentially saying, we can't serve you. And Plaintiffs here actually reached out to Uber, and they tried to take the only gesture that wouldn't be futile. They reached out to Uber with a letter and asked, we would like to use your service, but it is inaccessible to us because we need wheelchair accessible vehicles. Uber refused, and that's why we're here. So they actually took the one step that isn't futile. The other steps, including download the app, are futile gestures that are not required to make under the ADA. Well, can I just tease that out again? Because why not download the app and then say, we want to arbitrate the no wheelchair accessible vehicles? I get it, Your Honor. Well, that feels a lot more concrete and imminent. You've got the app. You say, we're ready to use it. We're dying to use this. We want one of your cars. We want one of your drivers. We got the app. We're on the app. There isn't the option. I mean, that's standing. Your Honor, Plaintiffs have given concrete situations where they would have in the past used Uber and couldn't because it was inaccessible, where they would now, and when they would in the future. The question is, where do you draw the line? Do they have to download the app? Do they have to make a reservation? What other steps do they have to take? They're all futile. The only reason that Uber is seeking plaintiffs to download the app has to do with the arbitration clause. Well, I mean, at one level, I mean, look, I mean, maybe the hypo, and I don't know how this hypo teases out, and maybe it's better for your adversary than you, but I think both of you have referenced the whites-only sign in a window. What if it was whites-only and then an asterisk next to it, subject to arbitration? What do you have to do in that instance? You have to say, oh, I didn't go because it said whites-only, or do you have to go through the action of saying, okay, it said whites-only, but it was subject to arbitration. Now I'd like to go arbitrate, and then once I lose an arbitration, then I know that it's really not standing, because that seems a little more like what's going on. That's actually not the factual situation that's going on here, because at the point at which our folks decided they were not going to use the service, had nothing to do, they hadn't opened the terms of use. There was no sign saying arbitration. It was because the service was inaccessible. They decided to reach out to Uber and ask for them to make the service accessible, so it would be saying to the manager of the restaurant, please don't discriminate. I see you have a sign out there that discriminates. That's the situation we're in. The arbitration agreement hasn't reared its head yet. What if the sign said, I'm thinking this on the fly, but what if it said whites-only, star, subject to arbitration? Does someone who hasn't arbitrated have standing to say, look, I didn't want to arbitrate? You say, star, but we may change that policy subject to arbitration. What's required for standing? Can you just look at the sign and say, look, I got standing, or do you have to go through that process? Is it fair, maybe, to require people to go through those extra hurdles to have standing? That actually seems like more of an arbitration question than a standing question, because that person probably has standing based on an injury, but I would turn the court to the Pennsylvania law on arbitration under the Toll Brothers case, where it says the burden rests on the party asserting estoppel to establish estoppel by clear, precise, and unequivocal evidence. There may be no debate about that person having standing. Standing is not based on the arbitration agreement, and I think that's where this is getting all confused. Standing is based on an injury that was caused by Uber that is regressible in court. Here you have injuries. There's no question plaintiffs have been denied service, essentially they've experienced harm on particular days, particular events, when they could have used Uber but didn't. It's caused by Uber because Uber does not provide accessible service, and it is regressible in court because there's a reasonable modification component of the ADA that allows plaintiffs to seek changes to policies and provisions of the service unless it's an undue burden to do so to make it accessible. We have all those factors here. Everything is met. The arbitration issue is an aside. Sorry, Your Honor. Would the substance of your claim be any different if one option was the act and another was to call an 800 number for a card account? So, Your Honor, in theory, if the plaintiffs had already experienced discrimination and they experienced ongoing discrimination, the ADA allows a person being subjected to discrimination to avoid a fetal gesture. So, in theory, that person who has already experienced, they already want to use Uber and they want to use it on specific occasions and they can't because it's not accessible in their city. That person has already experienced an injury. They're being discriminated against right now under 12188 of the ADA. That person does not need to take any steps. So, whether it's a phone call or whether it's any additional steps or it's downloading the app, and the way we look at it in terms of how those are futile, they wouldn't do a darn thing to create accessible service. Calling the number, downloading the app, making the reservation, whatever that is, Uber has already refused to provide accessible service in Pittsburgh. That's the problem, and that's what gives them standing. So, I guess this goes to just understanding the nature of your claim and the extent to which it rests on the underlying service versus the mechanism to call that service. And if I understand you correctly, the mechanism, whether it's telephone call or app or some other way of walking into a location to in-person make a reservation, you're saying those are not relevant to your claim, to the ADA claim? Your Honor, the ADA claim is based on the lack of accessible service. So, a non-disabled person in Pittsburgh has an on-demand transportation service. They want to go see grandma at 9 o'clock at night, as grandma called them. They can do that. The wheelchair user cannot. That's the problem. That's the claim. That is discrimination on the basis of disability, and under Title III of the ADA, a person who is experiencing right now being subjected to discrimination can ask for reasonable modifications to a company's covered entities programs, as long as those are not an undue burden of fundamental alteration. That's what we've got here. Let's say that we agree with Uber that you are speaking at least as having standing for the ADA injury. You're speaking to take advantage of the terms and conditions of the Act, and therefore the arbitration clause to be applied is against the client, even though non-disabled. Does that position raise other concerns under the law in terms of a requirement that people are waiving their right to proceed in federal court to pursue ADA claims? It becomes sort of circular. You're necessarily waiving your right to proceed via litigation and consenting to arbitration, even to be able to bring your ADA claim. Your Honor, we see the circular nature of that concern. We are not living in a vacuum in that sense, and we are concerned about that generally. However, that's not an issue in this case because plaintiffs are not relying at all on the terms of use. We actually looked at the terms of use after this case was filed when Uber put a copy of the terms of use with its motion, and there's one, I think it starts at 855 of the appendix. There's actually nothing to do with plaintiff's claims. There's nothing to do with accessible service or wheelchair use or discrimination or anything like that. Is there any legal impediment to a service provider making access to their services conditional on a waiver of your right to proceed to a jury trial in federal court? Your Honor, I do see a concern with that, and I think there is an impediment there, but I think there is a difference in this. So even if that impediment existed, there is a difference in this case because the plaintiffs are already been injured. They are not directly benefiting from the contract. They're not seeking to exploit the terms of the contract. In all the cases that discuss whether somebody's exploiting the terms of the contract, there's usually a term of the contract somebody seeks to enforce, and there's no term of the contract that our plaintiffs are seeking to enforce. In fact, they're seeking not to deal with the contract at all. I'm going to make sure I can trace your argument. Tell me if I've got anything wrong here. What you're saying is that plaintiff's theory of standing disavows any reliance on the terms and conditions of the contract. It relies instead on a categorical refusal by Uber to provide wheelchair accessible vehicles. Because it disavows any reliance on the terms and conditions of the contract, that the terms and conditions of the contract are not inextricably intertwined with the motion to compel arbitration under the contract. The other question of this standing for categorical refusal to provide wheelchair accessible vehicles, that may be before the district court. But for today, the question of the terms and conditions of the contract, that's not your basis for standing. You're disavowing. And so we can't get into other terms like the arbitration clause of the contract. Am I at least approximating your argument? That's a fair summary as to why there's no appellate jurisdiction, so to speak, to hear this. Correct. I think that – I appreciate the summary, Your Honor. I do want to say the injury – so just to add on to what you said, the injury exists irrespective of the contract because plaintiffs have already been injured without ever even reading the terms of the contract. How do you reconcile that with Larson, which seems to some extent at odds with Griswold and oddly doesn't even make an appearance in Griswold? So one of the key differences – and I actually think that Griswold and Larson can coexist, so there is actually no need to disavow Larson if you're going to follow Griswold. We certainly think the court should follow Griswold. One of the key differences with Larson is that the merits were already at issue. And so it makes sense for a court to say, like, do we actually have jurisdiction at all to consider the merits? Here, we've got this narrow sliver on a field, just a motion to compel arbitration. The merits are not at issue at all. So this case doesn't contradict or fly in the face of Larson. At that point, say we're on a motion for summary judgment and these issues come up again, it might be a different story. At that point, the merits were already – same thing, it's Larson and Steele. I think the merits were at issue. I mean, Larson and Steele was an interlocutory appeal. But the merits of the case had already been discussed by a district court, so the plaintiffs there had let – or the parties there had let the district court do its job. Here, we've just got this narrow sliver. The motion to compel arbitration, the only thing that is at issue. There haven't been any other rulings at all. That was cited in Griswold too, right? I'm sorry? Griswold also addressed the standing issue. That's correct, Your Honor, but I don't see a distinction between Griswold because Griswold allowed – Griswold said that the parties themselves, if they have a concern about standing, it's already gone through the district court, it can be raised on appeal. A couple of further things on Larson. Is it fair to say or do you agree that Larson involved immunity issues and this court has held that immunity-based challenges to jurisdiction merits interlocutory review while standing-based challenges do not necessarily? And I think that Petrolius was the case that brought Larson into that particular narrow reading. I think that is fair, Your Honor, and I just wanted to – I think that's a fair point. I just wanted to go back to Judge Krause's point to better articulate this. I guess what I'm saying, Your Honor, is you don't have to walk that line between Griswold and Larson in this particular set of facts because the merits are not at issue at all and the district court hasn't ruled on the merits. I'm not sure I understand why the merits were more at issue in Larson than they were in Griswold. Your Honor, I guess what I'm saying is distinguishing this case from Larson in that sense and the merits are – you don't have to disavow Larson to find that there's no need to add pendent jurisdiction to this case because the merits are not at issue here. Well, Mr. Killian, when he spoke about that issue, he said, oh, but if you read our briefing in the court below, you would understand that we were challenging standing. Your Honor, we do not agree that the court ruled on the merits of Larson's case. Well, I think the point is that Mr. Killian said that even though it was a motion to compel, that his client made substantive arguments on standing and, in fact, was asking for a standing determination in the context of the motion to compel. Your Honor, I'm not sure I understand why the court ruled on the merits of Larson's case, but I'm not sure I I just want to be clear. You used the term discretion. Are you suggesting we have discretion if we would like to reach the Article III standing question to do so? And did that play any role in Griswold, or was Griswold applying squarely a rule that prohibits reaching an issue on pending jurisdiction if it doesn't meet the standard of pending jurisdiction? Your Honor, I'm sorry. My understanding is that Griswold was applying a pending jurisdiction rule, and that's where we are today as well. Can I just go back to the magistrate judge's opinion? I mean, you know, I don't know. At one level, I think it's true that the magistrate judge's opinion didn't come right out and say plaintiffs have standing. I don't read that in the opinion. But at the same time, I think the magistrate judge's opinion said defendants are attacking a deterrence-based theory of standing for plaintiffs, and defendants' attack fails. So, I mean, it might not be a full, you know, bundle of sticks as far as standing, but it certainly says that there's some, you know, that defendants' deterrence-based theory attacks on standing don't work. I mean, it seems like if those attacks on standing fail, is there any other conclusion to draw than that the plaintiffs have a deterrence-based theory of standing? Your Honor, that's defendants' own theory for standing, and the court had to address that theory because that's what defendants raise. It's actually not plaintiffs' theory for standing. So, courts are often faced in law in motion with all kinds of theories from parties on a variety of issues. But when a court decides to not adopt a theory on a particular issue, it does not mean that the other party's theory on jurisdiction or standing or whatever it is— it seems good for you, though. It seems that they posited a theory of standing for your clients and then tried to shoot down that theory of standing for your clients. And the magistrate judge says, no, I won't let you shoot down that theory of standing for your clients. So, I mean, I guess my thought is you may be correct that that theory of standing was put on you, but now it seems that you've prevailed on that theory of standing. And I guess my thought is if defendants raise an argument and say you don't have standing for X reason, and a magistrate judge says, no, that's a bad reason, isn't the inference that you have standing for X reason? So, Your Honor, I think there are two different theories of standing entirely. And so I think we can take from what the district court said that the theory that defendants have put forth as to why plaintiffs don't have standing doesn't apply. But in terms of the theory that plaintiffs have standing, all of this was designed to—essentially it came in through Uber, and it was addressed by the district court because it was Uber's argument. In fairness, I mean, the people that usually raise a standing defense are the defendants. Plaintiffs usually don't walk into court and say, hi, the first thing we'd like to do is plead standing. But I guess I'm saying why are you resisting taking a win here when it feels to me like you won? It feels like they said you don't have standing on a deterrence-based theory, and the magistrate says Uber's argument's wrong. I mean, isn't the kind of—isn't the therefore that follows that, that we have standing on a deterrence-based theory? Your Honor, we're certainly not going to say that our clients do not have standing. So in that sense, taking a win at the district court level, and our assumption would be that the district court judge would—certainly wouldn't challenge us for that purpose on standing going forward with the case. So to that extent, yes. But at the same time, this isn't a 12B motion. This is a motion to compel arbitration. And so there—I mean, I actually find it odd that there is a pending 12B motion now that is sitting before the district court, and that seems to be the appropriate forum for Uber to raise standing. It doesn't—a motion to compel arbitration is really—is there at best equitable to stop it? That's it. Okay. Unless there are further questions at this point, I think we'll return to Mr. Killian for rebuttal. Judge Beedlestone? I have none, thank you. Okay. Mr. Killian, we'll give you your remaining minutes. Thank you, Your Honors, and I'll be brief. I appreciate the time you've given our case today. Mr. Seaborn acknowledged at the beginning that the Larson case was one where just a narrow sliver of the case was up on appeal. And yet, in that case, this court said it was the mandatory obligation of the court, consistent with Steele Co., to assess all matters of Article III standing. A couple—15 years later, Griswold approached that same question through the context of pendant appellate jurisdiction and said that we will do so only when it's inextricably intertwined. As I tried to say at the beginning of my argument today, I think we satisfy both standards, right? Larson's standard, clearly, is good for us. You have to consider Article III standing under Larson. Griswold says you consider it when it's inextricably intertwined. The two cases don't relate to one another. They don't talk about each other. I think there's a tension in the court's case law, but the court, if it doesn't agree with us that it's inextricably intertwined, then that tension is squarely presented. And we think, as Your Honors noted, the prior panel precedent rule applies in that instance. But Mr. Seaborn— I'm sorry, counsel. Can you reconcile? And in particular—and this is where the Raytheon decision does come into play—is there a distinct basis for standing to appeal when it comes to vindicating your rights under Section IV? Your Honor, we don't believe that the Raytheon case is useful because it was a Section IV case, Section IV of the FAA, right? And so the individual in that case, Raytheon, was the one who opened the federal courthouse doors. Raytheon was the one who first came to federal court. Section III is a defensive Federal Arbitration Act motion. Section IV is an offensive one. And so it makes sense to us in the Raytheon case why the court would examine the Article III standing of the person who first came to federal court, but not so— Can I just—I mean, look, it's really, really interesting what you're saying about the distinction between Section III and Section IV, right? One being offensive, one being defensive. I transpose it. But the point is this. You still get relief under Section III. It's defensive relief, but you still get something. And, I mean, I guess if you'll permit me to just think aloud, right? Like, I mean, let's just say there's a defendant who's being sued in whatever other type of case. And that defendant says, I just want a plain old ordinary stay in the case because, you know, the Third Circuit or a higher—you know, the Supreme Court is going to decide this case. But we don't say to that defendant, okay, you know, prove your standing in this case. You've been sued. They don't have to necessarily prove their standing in that case. They've already been sued. They're already in court. And so are you—so maybe what you're saying is we don't say, oh, do you have standing to seek a stay? Would you be harmed by a stay? Maybe, maybe that's the right analysis we should do. I'm just not familiar with that analysis. So that is—I'm sorry, I keep—I don't mean to— No, no, go ahead. If you know where I'm going, you can finish. No, it's more that the lag. I don't know when you've stopped. But, yes, that is exactly our position. The stay motion here is essentially a defensive procedural motion for a stay. And when a court grants a stay under the FAA Section 3, the court also retains jurisdiction in order to enforce issues that arise during the arbitration to enter the award at the end of the case. And so the court, when it grants a motion under Section 3, is telling the world, I've got this case. It comes within the scope of my Article 3 jurisdiction, and I'm going to decide this case. And so it is a procedural relief that we seek, you know, akin to where should this issue be decided. But ultimately, the issue—the court, the federal court itself is retaining jurisdiction over the case. And so a grant of authority—excuse me, a grant of a motion to be appelled under Section 3, you know, is the statement by the court that it believes it has jurisdiction over the underlying dispute. But I wanted to—if I could go back, because Mr. Seaborne, at the end of his argument, made a point that I think is critical to our view of why we succeed under Griswold's approach. He said—this isn't going to be a direct quote because I'm not a fast writer, but something along the lines of, if you accept Uber's theory of standing, it's inextricably intertwined with equitable estoppel. Yeah, he has a different theory of standing. Absolutely. I don't dispute that his theory of standing is one that is not inextricably intertwined with equitable estoppel. But ours is. And so that is the ultimate dispute—the threshold question. We have a basis—we assert that the only basis for their standing is based on the terms and conditions. They say they have a basis of standing apart from the terms and conditions. It's not possible, we think, to hypothesize one is correct or the other, because that is the question ultimately before the court. Now, Mr. Seaborne also said that he thinks his client has something more than a knowledge alone or more than a deterrence alone theory for satisfying standing in this case. I'll point the court to page 35 of his brief here, where they say, quote, They need not satisfy additional requirements beyond showing that they are aware of the lack of waves and are deterred from using Uber because of that knowledge. That's it. That is the theory they pleaded in their complaint, and it's the theory that the district court bought, and it's the theory that they continue to insist on today. He asked, where do we draw the line? Where do we draw the line for what needs to be done and what doesn't need to be done for a deterrent effect plaintiff? Well, the theory of deterrence, as the Seventh Circuit acknowledged in the Access Living case, is that a person need not expose himself to the discriminatory conduct. The allegedly discriminatory conduct here is requesting waves, but the plaintiffs here did not even get that far. They not only didn't request waves, they didn't sign up for the app. They didn't create an account. They didn't even look on the app to see what's available on the app. They stopped several steps short. So we're saying, yes, it's not required that they request a ride. If someone signs up for the app, someone creates an account and looks at it and says, I can't request a ride. We would agree they don't need to hail and require an Uber to come and then find out that they can't get into the vehicle. That is sufficient to write to Uber and make the request. We'd like to have wheelchair accessible vehicles within your fleet and have the answer no. Uber generally doesn't work with people who haven't signed up for its service. If they haven't shown a commitment to abide by our terms and conditions, I don't think that that's the kind of outside the scope work that Uber does. So I would distinguish what they propose here from a customer who has averred their reliance on Uber's terms and conditions, who's agreed to abide by our intellectual property rules. So is it then we're not even going to answer your question about whether we will provide these types of accessible vehicles because you have not signed up with our app? I don't know if I can answer that on behalf of the company. All I'm saying is that what I know is that if someone calls up and complains about Uber service and they're not an Uber user, that's not a high priority complaint. So, Mr. Trillian, I thought Mr. Seaborn had said that in the complaint there were allegations that, in fact, the plaintiff had contacted Uber and asked for a way, but were told that it was not going to be available. So my understanding is that the allegations in the complaint are along these lines. They squarely allege in the complaint that they'd never signed up for the app, and yet they tried to contact Uber to find out about the scope of its service. They tried to, or in the complaint doesn't speak, but perhaps you can speak to what is actually in the complaint. Well, perhaps they tried to and they didn't go. Sorry, sorry to interrupt. Mr. Seaborn, could you tell us whether it is those allegations are on the complaint? And if so, what do you think, what impact do you think those allegations have on this discussion, if any? Your Honor, I think it's in paragraph 95, but I will double check. And plaintiffs reached, they contacted Uber and... 95. Plaintiffs contacted Uber requesting that it reasonably modify its policies and practices to ensure that persons needing wheelchair accessible vehicles have full and equal access to Uber's on-demand transportation services in Allegheny County. Uber has failed to make those modifications and continues to provide no wheelchair accessible vehicles as part of its on-demand transportation services. So that was the allegation. So does that, how does that impact this analysis? Your Honor, are you asking me? Well, I mean, I'd like to hear from either of you. So, Your Honor, so there are a couple of things. Because plaintiffs did what is essentially only non-feudal gesture available. Anything else they would have done would not have provided, would not have made the service accessible to them. They actually wrote Uber and said, you don't provide accessible service in Pittsburgh. We need accessible service in Pittsburgh. You can make reasonable modifications to your service in order for that to happen. And Uber refused. And you say Uber refused. Did you actually, is there an allegation in the complaint that you received a response? Your Honor, it's, the allegation in the complaint is that they, I guess, that they did not, they failed to provide the service, which is true. But that's, that's where it ends. And so there's anything else would be entirely futile because Uber has failed to provide, they've done, they haven't remedied the barrier. And so I go back to the Seventh Circuit where the person is sitting outside the building. That person has to take any additional steps when they know there are stairs there. Here there was a request to provide accessible services and Uber failed to do that. That's it. Let's return to Mr. Killian's concerning your rebuttal time. That's, of course, Your Honors. What's your response? Sure. The complaint does not go further than that. My understanding is that what the complaint alleges is that they made a demand. And then it says in the next sentence, we did not, we did not comply with that demand. My understanding is that my client offered to engage in some kind of discussion and that they ignored the invitation and went to court. But that's not pleaded in the complaint and we haven't filed an answer yet in this case. I just want to say that's not, that's not what happened, but I know it's not in the record. So, so can I just tease this out? I mean, we played on this before, but I mean, is there, is there any, is there any question if, if, if a restaurant says, you know, whites only that a person who isn't white would, would have standing without having to try to go through the restaurant and get kicked out? I think that's exactly the Moose Lodge case, Your Honor, where the Supreme Court said the person needs to make an attempt, needs to apply for the job before they could bring the suit. Article three standing requirements cannot be futile. And so if I can give maybe a better example to describe the difference between what's going on in this case, I think, and a hypothetical. Imagine that there's a golf club that, you know, has a requirement that only people who have, you know, two or three recommenders within the club can join the club. And someone who is no, no friends at the club finds out that the pool isn't accessible in a certain way and sends a letter to the club and says, hey, I'd like you to make your pool accessible. And then maybe I'll go through the motions afterwards of making the friends in order to apply for membership to the club. That's our analogy here. Uber is a service that is limited only to people who've satisfied the qualifications. The qualifications are very easy to satisfy. They're nondiscriminatory. So this isn't, Judge Phipps, the example of a restaurant that only hires white employees or a restaurant that serves only people of a certain race. No one has ever complained that Uber's terms and conditions are discriminatory or that we're somehow selective on that end. So this is like a situation where there is a neutral, generally applied criteria for qualification to become a member, and the plaintiffs, thinking they can see further beyond the application process into what may or may not be available to them after they've applied, choose not to get as close as they can to the allegedly discriminatory conduct. And I would point the court to the three credit union cases cited in our briefs, Corello, Brinsley, and Griffin. They're all ADA cases. They're all cases where disabled individuals tried to access the website of a credit union, and they found that it didn't work with a screen reader. And so they brought a lawsuit. In the Fourth Circuit, the Sixth Circuit, and the Seventh Circuit all held that because these plaintiffs could not be members of the credit union at the end of the day, they didn't have the correct work history, they didn't live in the right communities, they didn't have families who had worked for various federal agencies, these are neutral criteria that the credit unions were limited to, but because these plaintiffs didn't meet those qualifications, even though they personally experienced the alleged ADA discrimination, they all lacked a concrete and particularized injury, and all three cases were dismissed. It follows up... The qualification that you're identifying here is that they waived their right to proceed in federal court. Is that a qualification to bring in an ADA claim? The qualification that we seek here, Judge Krause, is the agreement to all of our terms and conditions, including the requirement that someone agree to arbitrate their disputes with us. The ADA is not above arbitration. On the contrary, Congress in the ADA specifically encouraged parties to arbitrate disputes that involve ADA claims. I don't have the citation right in front of me, but there's a textual provision that specifically mentions arbitration in connection with the ADA. So, no, we're not imposing an unreasonable condition. We are imposing the condition... But it sounds to me, though, like the condition that you're imposing means that Uber can never get sued under Title III in federal court. Title III of the ADA.  If our arbitration agreement is not found invalid, that's exactly – yeah, many tech companies today impose arbitration terms through their terms and conditions for a variety of business reasons. We prefer the efficiency and the economy of that to long and drawn-out litigation in a federal court. So, I mean, we kind of have this deeper question that's behind the scenes, which is, is that every now and then arbitration agreements are deemed unconscionable or unenforceable or something like that. And so we've got that deeper question that's not really in play here, but it sounds to me like there's no daylight. Either once plaintiffs sign up for your app, they're never coming to federal court. It seems like they've tried to go as far down the road as they can to get standing without signing up for your app. And on the standing question, we've got this – if we get to it, we've got this really interesting question of, is that far enough, or does your app reach out far enough to kind of grab them and say, aha, if you want standing, you have to do this, and now you're arbitrating. You're never going to get a chance in federal court. So that's exactly the gambit, Your Honor, that the plaintiffs have undertook in this case. And so for all these reasons, and again, with thanks for the time and the attention that the court is giving to this case, we ask that the decision below either be reversed or that it be vacated in order to be dismissed for lack of jurisdiction. Thank you very much. Is it possible, Your Honor, to have one minute to respond? We've given a lot of time in this case already, and server rebuttal is extremely rare. I'm not sure – I've seen a case where we've allowed it. So at this point, given the time we've allotted, I think it's applying. But I'd like to thank counsel for excellent argument today and for their helpful briefing, and we will take the case under advisement. Thank you.